RECEIPT #_____
AMOUNT $ 150.00
SUMMONS ISSUED Yes
LOCAL RULE 4.1_____
WAIVER FORM _____
MCF ISSUED_____
BY DPTY. CLK. Kim Abair
DATE 11/26/03

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SERONO, INC. and
ARES TRADING S.A.,

          Plaintiffs,

v.

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW
YORK,

          Defendant.

CIVIL ACTION No.

03-12401 MLW

MAGISTRATE JUDGE Bowler

**COMPLAINT FOR A DECLARATORY JUDGMENT OF NONINFRINGEMENT, INVALIDITY AND UNENFORCEABILITY OF DEFENDANT'S U.S. PATENT NO. 6,455,275, AND A DETERMINATION THAT PLAINTIFFS OWE NO ROYALTIES TO DEFENDANT**

**INTRODUCTION**

1. In 1983 defendant The Trustees of Columbia University in the City of New York ("Columbia") obtained a patent on a recombinant DNA technology called "cotransformation," a process for inserting foreign DNA into a host cell to produce certain proteins. This patent, and two companion patents (sometimes hereinafter "Original Axel Patents") which Columbia agreed should expire at the same time, expired in 2000. In 2002, two years after the expiration of the Original Axel Patents, Columbia improperly obtained yet another patent on its cotransformation technology, and it is now attempting to use that patent in an illegitimate effort to extend its patent monopoly for another seventeen years. Plaintiffs bring this action for a declaration that Columbia has no lawful right to receive royalties from plaintiffs, based on its newly-issued cotransformation patent and any related pending patent applications, because that patent is invalid and unenforceable.

25357346.2

2.      The Original Axel Patents originated from a single patent application filed by Columbia on February 25, 1980 and were based upon the same experimental research described in that application. The National Institute of Health ("NIH") funded the research that led to this invention described in the February 25, 1980 application, and granted Columbia "title" to the invention, subject to certain conditions. Among these was a condition that "any license granted by [Columbia] shall include adequate safeguards against unreasonable royalties and repressive practices." Because the United States Patent and Trademark Office ("PTO") determined that the second and third of Columbia's cotransformation patents claimed obvious variants of the first patent, and thus constituted impermissible "double-patenting," the PTO required Columbia to disclaim any rights in those patents extending beyond the expiration date of the first issued patent. As a result, the Original Axel Patents all expired on August 16, 2000 whereupon the invention passed into the public domain, and, therefore, the public, including plaintiffs, became entitled to manufacture products covered by the invention in the United States free from any royalty obligations.

3.      Columbia licensed its Original Axel Patents to over thirty biotechnology companies and received hundreds of millions of dollars in royalty payments from those companies before they expired in 2000. In that year, Columbia mounted a widely criticized campaign to obtain special legislation from Congress extending the term of its original cotransformation patent by fifteen months, the result of which would have been a $100 million windfall for Columbia in the form of additional royalty payments from its licensees. This led to a public outcry and Congress soundly rejected Columbia's effort.

4.      Unbeknownst to Congress and the public, however, Columbia was at the same time prosecuting still more patent applications on its cotransformation technology. Columbia

filed two applications in 1995 claiming priority back to the February 25, 1980 application, but then delayed prosecuting them through a variety of dilatory tactics. Significantly, Columbia filed these two applications only a day before the effective date of patent reform legislation inhibiting Columbia's delaying tactics. When Columbia's lobbying effort failed, Columbia refocused its efforts on its still pending patent applications. Through this strategy, Columbia found an alternative means to extend the life of its patent monopoly, not just for the fifteen months Columbia had requested unsuccessfully from Congress, but for seventeen years. By misleading the PTO about the claim scope of its Original Axel Patents, Columbia obtained for itself on September 24, 2002 *a fourth* cotransformation patent, with a term extending all the way to 2019, based on the *same* research described in the *same* 1980 patent application that had given rise to the first three cotransformation patents. Columbia then demanded royalties on this new patent from the companies that had licensed the earlier cotransformation patents, including plaintiffs. Because that patent is invalid and unenforceable, as explained below, this Court should grant declaratory and injunctive relief preventing its enforcement against plaintiffs.

## THE PARTIES

5. Plaintiff Serono, Inc. is a Delaware corporation with its principal place of business at One Technology Place, Rockland, MA. Ares Trading S.A. ("Ares") is an affiliate of Serono, Inc. and is a Swiss corporation with offices at Chateau de Vaumarcus, 2028 Vaumarcus, Switzerland. (Serono, Inc. and Ares Trading S.A. are sometimes collectively referred to herein as "Serono").

6. Serono and its affiliates are engaged in the discovery, development, manufacture and sale of prescription pharmaceuticals for significant unmet medical needs. As a result of this research, Serono and its affiliates developed and Serono, Inc. markets in the U.S. a pharmaceutical composition containing interferon beta-1a (Rebif®), for treatment for multiple

sclerosis, and a pharmaceutical composition containing follitropin alfa (Gonal-f™), for treatment of infertility in men and women. These products are manufactured outside the United States.

7. On May 1, 1992, Ares entered into a license agreement ("License Agreement") with Columbia to obtain rights to use the cotransformation technology that Columbia patented. Since that time, Ares has paid more than $6 million to Columbia under the License Agreement.

8. Defendant Columbia is a New York non-profit corporation with a principal place of business in New York, New York. It is the owner by assignment of United States patents 4,399,216 (the "'216 patent"), 4,634,665 (the "'665 patent"), and 5,179,017 (the "'017 patent"), which it licensed to Ares and its affiliates in the License Agreement.

9. Columbia is the owner by assignment of recently issued United States patent 6,455,275 ("'275 patent").

10. In 1993, Columbia brought suit to enforce the '216, '665, and '017 patents against a third party in this District, *The Trustees of Columbia University in the City of New York v. Roche Diagnostics GmbH*, C.A. No. 93-11512-NG (hereinafter "Roche Litigation"). Additionally, there are three cases in this District seeking a declaratory judgment of invalidity and unenforceability; *Biogen, Inc. et al. v. The Trustees of Columbia University in the City of New York*, C.A. No. 03-11329-MLW; *Wyeth et al. v. The Trustees of Columbia University in the City of New York*, C.A. No. 03-11570-MLW and *Baxter Healthcare Corp. v. The Trustees of Columbia University in the City of New York*, C.A. No. 03-12221-MLW.

## JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201(a), and 2202. Also, because the amount in controversy exceeds $75,000, and the action is between citizens of different states, the Court has jurisdiction under 28 U.S.C. § 1332(a)(1).

12. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### A. Columbia's Original Cotransformation Patent Application

13. In the late 1970's, Richard Axel, Michael H. Wigler, and Saul J. Silverstein, scientists at Columbia University, carried out research on methods of inserting genes that code for certain proteins into the DNA of certain types of eukaryotic host cells. (Eukaryotic cells have a discrete nucleus, as distinguished from procaryotic cells, which are principally bacteria and lack a structurally discrete nucleus.) Specifically, the Columbia scientists conducted experiments in cotransformation, a process of altering the genotype of a eukaryotic host or "recipient" cell by inserting into the cell *both* (a) a DNA sequence coding for a desired protein and (b) a DNA sequence coding for a "selectable marker." A selectable marker confirms that the cell has been successfully transformed. For example, certain types of selectable markers may make a cell resistant to substances or conditions in the culture medium that would ordinarily kill the cell. A researcher can infer that this type of selectable marker has been incorporated into the cell's nuclear DNA if the cell survives in such hostile cell culture conditions. If the selectable marker has been incorporated into the host cell's nuclear DNA, it is likely that the cell has also incorporated the DNA sequence coding for the desired protein.

14. After conducting experiments concerning the cotransformation of certain types of mouse host cells with certain types of genes, Axel, Wigler, and Silverstein filed U.S. Patent Application Serial No. 06/124,513 ("'513 application") on February 25, 1980. The '513 application was assigned to Columbia. The invention described in the '513 application was based upon research performed under grants from NIH. The NIH granted title to the invention to Columbia, but only upon certain conditions. Among these was the condition that any license "shall include adequate safeguards against unreasonable royalties and repressive practices.

Royalties shall not in any event be in excess of normal trade practice." The '513 application has resulted in the issuance of several U.S. patents all assigned to Columbia.

### B. Original Axel Patents Result From the '513 Application

15. The first such patent, U.S. Patent No. 4,399,216 ("'216 patent"), was issued August 16, 1983, and was entitled "Processes for Inserting DNA into Eucaryotic Cells and for Producing Proteinaceous Materials." The '216 patent had 73 claims, broadly covering (a) processes for cotransforming cells, (b) processes for producing and recovering protein from a cotransformed cell, (c) processes for detecting cotransformed cells, and (d) cotransformed cells. It had a term of 17 years from the date of issuance, thus it would expire on August 16, 2000.

16. Shortly before the '216 patent issued in 1983, Columbia filed a continuation application, serial no. 06/522,408 ("'408 application"). After almost three and one-half years of prosecution of the '408 application, the PTO allowed claims and issued the '665 patent in January, 1987. The claims of the '665 patent closely resembled the claims of the '216 patent. Specifically, the '665 patent claims (a) processes for cotransforming cells, (b) processes for producing and recovering protein from a cotransformed cell, and (c) cotransformed cells. In order to secure allowance of the '665 patent in the face of double-patenting rejections, Columbia was required to file a terminal disclaimer by which Columbia agreed that the term of the '665 patent would not extend beyond the August 16, 2000 expiration date of the '216 patent. Pursuant to the terminal disclaimer, the '665 patent expired on August 16, 2000. Columbia made no attempt to deny that the claims of the '665 patent were obvious in view of the '216 patent.

17. Columbia's effort to obtain additional patents did not end with the '665 patent. In what was to become an oft-repeated tactic, Columbia filed another continuation application, serial no. 06/915,273 ("'273 application"), on October 3, 1986, again based on the specification of the '216 patent (and thus on the same research conducted in the late 1970's), shortly before

the then-pending '408 application matured into the '665 patent. In the case of the '273 application, however, Columbia abandoned it after two years of prosecution and filed another continuation, serial no. 07/346,089 ("'089 application"), on May 2, 1989. Columbia then abandoned the '089 application after three years in favor of yet another continuation, serial no. 07/716,915 ("'915 application"), filed on June 18, 1991.

18.  By repeatedly filing new applications based on the original specification and research, Columbia has continued, even up to the present, to prosecute claims based on the now decades-old research of Axel, Wigler, and Silverstein. Columbia's practice of "submarine" patenting allowed it to abuse the patent system by "surfacing" with a new patent many years or even decades after filing the original application. Keeping its original specification alive by filing one continuation or divisional application after another, Columbia sought to obtain new patents to capture the latest developments in the biotechnology industry.

19.  In the case of the '915 application, which Columbia filed more than a decade after the original 1980 application, Columbia used its submarine patenting strategy to seek and obtain claims containing features not originally disclosed.

### C. Columbia's Failed Attempt to Persuade Congress to Extend Its Patent Monopoly

20.  The Original Axel Patents were set to expire on August 16, 2000. Shortly before they were due to expire, Columbia embarked on an aggressive lobbying campaign to obtain special legislation from Congress extending the term of the '216 patent. Columbia claimed, among other things, that the income stream from the patent was "absolutely critical" and the "single most important source of free and clear funding" for the university. Notwithstanding the importance of the royalty stream to Columbia, the university claimed that the biotechnology industry was not burdened by paying these royalties, which Columbia characterized as "nominal."

21.  During its campaign to persuade Congress to extend the term of the '216 patent, Columbia described its patent as pioneering, and as having great breadth and scope. Columbia represented to Congress that its '216 patent "covers the process for transforming animal cells so they can produce proteins used in biological pharmaceutical products." According to Columbia, it was the '216 patent that "makes it possible to generate the cell lines that are needed to produce patented drugs." As Columbia told Congress, its patents broadly claimed both "the cotransformed cells and the process of making them."

22.  In its submissions to Congress, Columbia requested urgent action on its patent term extension request, representing that "Columbia's cotransformation patent expires on August 16, 2000." Columbia did not tell Congress that Columbia was simultaneously prosecuting secret patent applications that sought the issuance of new patents, with new 17-year terms, claiming the same cotransformation technology. And, just as Columbia did not tell Congress that it was seeking further patent term by pursuing additional continuation applications, Columbia did not tell the PTO what it told Congress, namely, that it believed the '216 patent to have extremely broad claim scope, covering both cotransformed cells and the process of making them.

23.  Columbia's request for extension of the term of the '216 patent met with widespread public outcry, and Congress rejected it, recognizing that Columbia had already reaped rich rewards from its seventeen-year patent monopoly. Congress decided that biotechnology companies should not be burdened by paying additional royalties for the period after the expiration of the '216 patent under their licenses with Columbia. Thus, the inventions claimed in the '216, '665, and '017 patents passed into the public domain in August 2000. This meant that plaintiffs, and other biotechnology companies, were free to develop and sell recombinant biological products without the economic burden of paying further royalties to

Columbia. Referring to Congress's rejection of Columbia's proposed special legislation, Columbia's spokesperson said, "I do not believe there's a next step in this patent extension story . . . it's an issue that's by us. . . . Either you get the patent extended or it expires, and there's just no way to go back after it expires, so we're not going to be making any attempt."

### D. The '275 Patent Surfaces Two Years After Expiration of Original Axel Patents

24.    Contrary to Columbia's statement and unbeknownst to Congress, its licensees and the public, Columbia had already planned to lengthen its cotransformation patent monopoly by using its favorite submarine patenting strategy. Shortly before the '017 patent issued in January 1993, Columbia had filed yet another continuation. Indeed, it ultimately filed *five* more continuations based on the original specification describing the early research of Axel and his colleagues. Instead of "surfacing" with a submarine patent, however, Columbia abandoned most of those continuations after desultory prosecution, only to file yet more continuation applications.

25.    However, effective June 8, 1995, Congress reformed the patent law to close many of the loopholes that had made submarine patenting possible. On June 7, 1995, *the day before this change in the law went into effect*, Columbia secretly filed *two* further continuation applications based on the original specification of the '513 application. Under the reform legislation, these two applications were "grandfathered" because they were filed one day before the change in the law went into effect.

26.    Since these continuation applications were the last Columbia could file under the pre-reform patent prosecution rules, Columbia could not simply abandon them and further drag out the patent prosecution process as it had done so many times before. If it had filed new continuation applications after June 7, 1995, any patent to issue from those applications would have expired, under the new rules, in February 2000. Instead, Columbia employed dilatory

tactics to keep its June 7, 1995 continuation applications pending, including filing for extensions and filing notices of appeal to gain additional time. These tactics delayed the issuance of additional patents and thereby extended the term of those patents as far as possible into the future.

27. Using these tactics, Columbia strung out the prosecution of the continuation applications to such an extent that one application is still pending eight years after filing and the other did not mature into a patent until more than seven years after its filing date.

28. On September 24, 2002, almost twenty-three years after the filing of the original specification and more than two years after the expiration of its Original Axel Patents, one of these applications, serial no. 08/484,136 ("'136 application") issued after numerous amendments as the '275 patent now in suit. Yet another application filed the same day as the '136 application, serial no. 08/477,159 ("the '159 application"), is *still pending* at the PTO. In this application, Columbia is pursuing claims specifically directed at the commercial products of certain licensees, including products first marketed after the expiration of the '216, '665, and '017 patents.

29. The '275 patent was the product of *eight* continuing or divisional applications, of which five were abandoned. During prosecution of the '275 patent, which did not even *begin* until fifteen years after Columbia filed the original application, Columbia sought extensions of time amounting to some twenty-two months, filed two notices of appeal that it did not pursue, and added many new claims at a late stage in the prosecution.

30. Columbia's dilatory prosecution of the '275 patent and its predecessor applications was not Columbia's only abuse of the patent process. Columbia also resorted to misleading the patent examiner to obtain the patent, as set forth below in paragraphs 51-84.

31.  Like the '017 patent, the '275 patent claims transformed CHO cells. It also claims methods of producing and recovering protein materials and "DNA construct."

32.  Unlike the '017 patent, however, the '275 patent issued *without any terminal disclaimer*. Thus, although the discoveries on which it is based had to have been made before the original February 1980 filing date, the '275 patent, were it valid, would remain in effect until *September 2019*.

33.  Moreover, the combined terms of the new patent and the Original Axel Patents run for thirty-six years, from 1983 to 2019 (with a two-year gap between the expiry of the '216 patent and the issuance of the '275 patent). This combined term is far in excess of the limited monopoly contemplated by the Patent Act and would significantly burden the efforts of plaintiffs and other biotechnology companies to develop new innovative recombinant therapeutic and diagnostic products.

34.  Further, prior to the issuance of the '275 patent, Serono developed rights to the claimed technology, including the legal and equitable right to practice the invention(s) disclosed in the '513 application and/or claimed in the '216, '665 and '017 patents after August 16, 2000 free from any royalty obligations.

### E. Columbia's '636 Patent

35.  At about the same time or shortly after he completed the research on which the original '513 application was based, Axel collaborated with another researcher, James Roberts, to carry out further research on methods of cotransforming eukaryotic cells with foreign DNA encoding genes for producing desired proteins. Based on this research, which was closely related to the work that had led to the '216, '665, and '017 patents, Columbia filed a separate patent application on March 15, 1982. Columbia eventually abandoned this application, serial no. 358,206 ("'206 application"), in favor of filing a continuation. It repeated this tactic twice

more, ultimately receiving U.S. patent 5,149,636 ("'636 patent") on September 22, 1992, more than a decade after it filed the initial '206 application. As discussed more fully below, Columbia never disclosed the '636 patent or its file history to the examiner in the '275 patent prosecution so that he could make a determination of its materiality to the patentability of the '275 patent.

### F. Columbia's Licensing of the Axel Patents

36. From 1984 through 1997 Columbia licensed its Original Axel Patents to over thirty biotechnology companies and received hundreds of millions of dollars in royalty payments from those companies before they expired in 2000.

37. In May, 1992 Columbia granted a non-exclusive license under the '216, '665 and continuations and divisions thereof to Ares.

38. Columbia's license agreements with plaintiffs and other biotechnology companies required the licensees to pay royalties not only on Columbia's issued patents such as the '216 patent, but also on patents issuing from "any and all divisions, continuations and continuations-in-part" thereof. This provision gave Columbia significant incentive to keep spawning "children" of the issued patents, including the '275 patent.

### G. Columbia's Recent Demand Under the License Agreements

39. Shortly after the '275 patent issued, Columbia announced to Serono and other licensees that, contrary to their expectations that royalty payments under the license agreements had come to an end, the issuance of the '275 patent had triggered the obligation to pay royalties under the license agreements once again. For example, by letter to Serono dated November 11, 2002, Columbia advised Serono of the issuance of the '275 patent, and asked Serono to review its obligation under the License Agreement. Thus, although Ares believed that its royalty obligations to Columbia had expired with the expiration of the '216, '665, and '017 patents,

Columbia was now demanding royalty payments for another seventeen years, the term of the '275 patent.

40. Prior to the expiration date of the Original Axel Patents, Columbia informed Serono of its view that, under the License Agreement, Serono is required to pay royalties on Gonal-f™ and Rebif® sold in the United States even after expiration of the Original Axel Patents. According to Columbia, the License Agreement mandates that Serono continue to pay royalties based on its activities concerning Gonal-f™ and Rebif® so long as there remains any patent or patent application anywhere in the world which "covers" the sale of these products. Moreover, Columbia has taken the position that royalties are owed even if Serono's activities involving its products do not infringe the Columbia Axel patents. This is contrary to law and constitutes misuse of the patents.

41. Serono has informed Columbia that (a) the License Agreement does not require, and was never intended by the parties to require, payments of such post-patent royalties; (b) even if the License Agreement did require such payments, it would be unenforceable, as to U.S. patents, under controlling U.S. Supreme Court precedent that squarely prohibits enforcement of agreements that purport to extend the life of a patent beyond its statutory term and also, with respect to foreign patents, that payments are not owed after patent expiration and contractual requirements to the contrary are not enforceable, and (c) that Serono's activities with respect to Gonal-f™ and Rebif® do not infringe Columbia's '275 patent. Columbia has nonetheless persisted in the position that royalties are due based upon activities that occurred after the Original Axel Patents expired. Indeed, as detailed below, Columbia has recently filed a vaguely worded complaint in which it asserts, *inter alia*, that Serono has breached the License Agreement by "failing to pay all amounts due and owing to Columbia . . . ."

## CLAIMS FOR RELIEF

### COUNT I: DECLARATION UNDER THE LICENSE AGREEMENTS

42. Plaintiffs incorporate all prior paragraphs of this complaint.

43. Columbia contends pursuant to the License Agreement between Columbia and plaintiffs that plaintiffs must pay royalties under the '275 patent. Plaintiffs contend that they have no obligation to pay such royalties because, as set forth below, the '275 patent is invalid, unenforceable and not infringed. There is an actual controversy between the parties concerning plaintiffs' obligations under the License Agreement.

44. Plaintiffs are entitled to and seek a declaratory judgment that they have no obligation to pay any further royalties under the License Agreements.

### COUNT II: DECLARATION OF INVALIDITY OF THE '275 PATENT

45. Plaintiffs incorporate all prior paragraphs of this complaint.

46. Plaintiffs are entitled to and seek a declaratory judgment that the '275 patent is invalid for, without limitation, non-statutory obviousness-type double-patenting because each of the claims of the '275 patent is the same as, or merely an obvious variant of, inventions claimed in other patents owned by Columbia, singly or in combination.

47. Plaintiffs are further entitled to and seek a declaratory judgment that the '275 patent is invalid for failure to meet one or more of the conditions of patentability specified in Title 35 of the United States Code, including, without limitation, §§ 101, 102, 103, and 112.

48. There is an actual controversy between plaintiffs and Columbia concerning the validity of the '275 patent.

### COUNT III: DECLARATION OF UNENFORCEABILITY OF THE '275 PATENT FOR PROSECUTION LACHES

49. Plaintiffs incorporate all prior paragraphs of this complaint.

50. Plaintiffs are entitled to and seek a declaratory judgment that the '275 patent is unenforceable by reason of prosecution laches, specifically, Columbia's unreasonable delay in prosecuting the applications that resulted in the '275 patent.

51. The delay has caused and will cause plaintiffs to suffer material prejudice.

52. There is an actual controversy between plaintiffs and Columbia concerning the enforceability of the '275 patent

## COUNT IV: DECLARATION OF UNENFORCEABILITY OF THE '275 PATENT FOR INEQUITABLE CONDUCT

53. Plaintiffs incorporate all prior paragraphs of this complaint.

54. Plaintiffs are entitled to and seek a declaratory judgment that the '275 patent is unenforceable by reason of inequitable conduct, specifically, as set forth below, Columbia's (a) advancing misleading statements to the PTO about whether its claims were patentable, (b) advancing contradictory positions to this Court in the aforesaid Roche Litigation defined in paragraph 10 hereof, at the same time it was making the above statements to the PTO, (c) failure to make timely disclosure of a related application and its prosecution history, (d) failure to disclose the '636 patent and its prosecution history, and (e) failure to disclose statements it had made to Congress that were inconsistent with positions it took during prosecution of the '275 patent.

55. There is an actual controversy between plaintiffs and Columbia concerning the unenforceability of the '275 patent for inequitable conduct.

### A. Misleading Conduct Regarding the Patentability of Claims of the '275 Patent

56. The Original Axel Patents all relied upon the same original disclosure and they expired in August, 2000. To overcome double-patenting rejections, Columbia filed terminal

disclaimers that ended the term of the '665 patent and the '017 patent on the expiration date of the '216 patent. However, Columbia did not file a terminal disclaimer for the '275 patent.

### Misleading Statements and Omissions Concerning '017 Patent

57. During prosecution of the '275 patent, in an office action dated February 3, 1998, the examiner rejected all pending claims for double patenting over the issued claims of the '017 patent. These rejected claims, then numbered 126-132, were drawn to DNA constructs for transforming cells and, in the case of claim 132, eukaryotic cells transformed using such constructs.

58. In response to the February 3, 1998 office action, on July 24, 1998, Columbia canceled claim 132, the only claim to transformed eukaryotic cells then pending. Columbia also argued that the remaining DNA construct claims were not subject to double-patenting rejection over the '017 patent. Columbia stated: "The 'right to exclude' provided by claims 1-4 of U.S. 5,179,017 relates to transformed Chinese Hamster Ovary (CHO) cells. Thus, the 'right to exclude' provided by U.S. 5,179,017 relates only to the manufacture, use and sale of CHO cells. In contrast, the 'right to exclude' which would be provided by claims 126-131 of the subject application would, if allowed, relate to the manufacture, use and sale of DNA constructs." July 24, 1998 Response, pp. 2-3 (emphasis in original). Thus, Columbia acknowledged that the claims that issued in the '017 patent relate to transformed CHO cells.

59. Three years later after the a new examiner was assigned to the '275 prosecution, Columbia, in an amendment dated June 14, 2001, added numerous new claims, some of which ultimately issued in the '275 patent. Several of the new claims were drawn to transformed eukaryotic and CHO cells and thus were similar to cancelled claim 132. The Remarks accompanying this amendment stated that the new claims were "not subject to the obviousness-type double-patenting rejection." It then listed the claims in groups and explained why each